IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| CLINTON M. BOLTON<br><br>      Plaintiff,<br><br>v.<br><br>TUFF SHED, INC.<br><br>      Defendant. | CIVIL ACTION NO. 2:17-CV-14917 |

## COMPLAINT

Plaintiff Clinton M. Bolton asserts his causes of action against defendant Tuff Shed, Inc. as follows:

### THE PARTIES

1. Plaintiff is Clinton M. Bolton, a person of age and majority, and a resident and citizen of Texas.

2. Defendant is Tuff Shed, Inc., a foreign corporation incorporated (upon information and belief) and headquartered in Colorado, and registered in and actively doing business in Louisiana.

### JURISDICTION AND VENUE

3. The Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question) and 42 U.S.C. § 12101 *et seq*. (the Americans with Disabilities Act as amended), as more particularly set-out herein.

4. The Court has personal jurisdiction over Tuff Shed as it is a corporation registered and actively doing business in Louisiana, and, through its registered agent for the service of process, is present within Louisiana at the time this suit commenced.

5. Alternatively, the Court has personal jurisdiction over Tuff Shed as it regularly transacts

business in Louisiana and regularly employs Louisiana citizens, committed a tortious act within Louisiana giving rise to the causes of action in this case, and derives substantial revenue from the services it provides in Louisiana. Thus, Tuff Shed has established minimum specific contacts with Louisiana, arising from the specific facts of this case, comporting with the requirements of fair play, substantial justice, and the Fourteenth Amendment of the Constitution of the United States.

6. Venue is proper in this Court pursuant to 42 U.S.C. § 12117 (incorporating Title VII's venue provision in ADA cases) and 42 U.S.C. § 2000e–5(f)(3) (the Title VII venue provision) because (1) the unlawful employment practices alleged herein were committed in Louisiana within this judicial district (specifically, Laplace in St. John the Baptist Parish), (2) upon information and belief the employment records relevant to this action are found within this judicial district (the same), and (3) but for the unlawful employment practice, Mr. Bolton would have continued to have been employed in this district (the same).

## PROCEDURAL AND STATUTORY REQUIREMENTS

7. At all relevant times, Tuff Shed employed more than 500 full-time employees.

8. On or about October 20, 2015, Tuff Shed hired Mr. Bolton as a full-time, hourly employee in the position of "production manager" at its Laplace, Louisiana manufacturing and sales office.

9. On or about August 16, 2016, Tuff Shed terminated Mr. Bolton's employment.

10. Mr. Bolton alleges Tuff Shed unlawfully terminated his employment in violation of the Americans with Disabilities Act and in retaliation for engaging in protected activity under the ADA.

11. Mr. Bolton timely filed his Charge of Discrimination with the EEOC at its Dallas, Texas

District Office on August 30, 2016.

12. The EEOC District Office in Dallas transferred the case to its New Orleans Field Office, and the New Orleans Field Office conducted an investigation into Mr. Bolton's ADA discrimination and retaliation claims.

13. The EEOC, through its New Orleans Field Office, issued its Notice of Right to Sue letter on September 27, 2017.

14. Mr. Bolton timely filed this complaint within 90 days of receiving the EEOC's Notice of Right to Sue letter.

## FACTS

### A. The Plaintiff – Clinton Bolton

15. Clinton Bolton is a 43 year-old man who lives in Texas with his partner and five year old daughter.

16. Mr. Clinton spent most of his adult work-life working in construction, and for twelve years as a contractor for Tuff Shed in and around the Austin and San Antonio territories in Texas.

17. Tuff Shed thought so highly of Mr. Bolton as its contractor that it offered him a management-level position in its New Orleans, Louisiana territory in the fall of 2015.

18. Although it represented a decrease in pay from his contractor wages with Tuff Shed, Mr. Bolton accepted Tuff Shed's job offer because of the growth opportunity it represented, and Mr. Bolton relocated he and his family from Dallas to the New Orleans area in the fall of 2015.

### B. The Defendant – Tuff Shed, Inc.

19. Tuff Shed, Inc. is a corporation based out of Denver, Colorado that specializes in the retail sale and on-site, residential construction of sheds and other detached storage structures

across the United States.

20. Tuff Shed subdivides its business into various geographical territories, and at all relevant times maintained a manufacturing and sales office in Laplace, Louisiana, which serviced the greater New Orleans area.

21. Upon information and belief, and at all relevant times to this lawsuit, Tuff Shed, Inc. employed more than 500 employees.

**C.     Mr. Bolton Excels at Tuff Shed and Is Widely Praised by His General Manager**

22. Mr. Bolton began work at Tuff Shed's Laplace office on or about October 2015.

23. At all relevant times, Mr. Bolton's job title was "production manager."

24. Mr. Bolton's essential job functions were to supervise the construction of Tuff Shed products and train subordinates to construct those products.

25. At all relevant times, Mr. Bolton's supervisor and decision-maker was Chris Powell, who held the position of "general manager," and who was the ultimate, authorized decision-maker on all employment and business decisions at Tuff Shed's Laplace store.

26. Upon information and belief, when Mr. Bolton began working at Tuff Shed's Laplace facility in October 2105, that store ranked in bottom 10 of the approximately 45 Tuff Shed production facilities across the United States for Tuff Shed's production metrics.

27. Immediately, Mr. Bolton's leadership and management decisions cut production costs at the Laplace store by a full percentage point in both November and December 2015.

28. Mr. Bolton received tremendous praise from Chris Powell.

29. On December 9, 2017, Chris Powell sent the following email to both Mr. Bolton and Homer Seanz, who was a general manager at the Austin, Texas region, as well as Tommy Sedotal, who was Chris Powell's regional manager and decision-maker:

> *Homer,*
>
> *I believe you and Clint had a bet going that he couldn't shave 1% off of prefab labor, not only did he accomplish that but he shaved 1.1% off of overtime too!*
>
> *Great job, Clint!*
>
> *I think you should bet him to take off another 1% this month on prefab labor, thoughts?*
>
> *Thanks*
> *Chris*

30. Mr. Bolton continued to excel at the Laplace store.

31. Mr. Powell thought so highly of Mr. Bolton's performance that he recommended Mr. Bolton be placed on a special company-wide committee dedicated to improving Tuff Shed's production practices, and Tuff Shed did, in fact, place Mr. Bolton on that committee.

32. Further, upon information and belief, at the time of Mr. Bolton's termination, the Laplace store had undergone an tremendous turnaround and was ranked 4th overall of the approximately 45 Tuff Shed stores across the United States for Tuff Shed's production metrics.

33. Upon information and belief, the turnaround at the Laplace store was directly attributable to Mr. Bolton's efforts, and Chris Powell was aware of this fact.

**D.    Mr. Bolton Is Injured on the Job and Mr. Powell Begins to Plan His Termination**

34. On Thursday, June 23, 2016, Mr. Bolton attempted to move a door from one location to another. When he attempted to lift the door, he suffered a complete rupture of his biceps tendon from the radial tuberosity attachment, resulting in approximately a 6 centimeter retraction.

35. Mr. Bolton immediately alerted assistant general manager Todd Benoit, who then informed Chis Powell.

36. The next day, Mr. Powell instructed Mr. Bolton to report to a company physician for drug testing a medical review, and Mr. Bolton did so.

37.     Mr. Bolton was not using any medication or other illegal substances at work and passed the drug screen.

38.     The company physician indicated that Mr. Bolton required an MRI on his upper arm.

39.     Upon his best reflection, that same day Mr. Bolton informed Mr. Powell about his need for an MRI.

40.     Two days later, on June 26, 2016 – which was a Sunday – Chris Powell secretly created an adverse "Performance Development Plan" that alleged Mr. Bolton had become deficient in several areas of his production manager position.

41.     Prior to Mr. Bolton's injury, neither Chris Powell nor any other Tuff Shed employee had ever counseled, reprimanded, or alerted Mr. Bolton to any of the alleged deficiencies described in Powell's Personal Development Plan.

42.     In reality, Mr. Bolton had at all times performed his job in the exemplary manner that had won him praise from Mr. Powell prior to Mr. Bolton's injury.

43.     Upon information and belief, Mr. Powell pretextually created the Personal Development Plan because Mr. Powell feared that Mr. Bolton was seriously injured and would require disability-related medical leave or other reasonable accommodation under the Americans with Disabilities Act.

44.     In other words, Mr. Powell created the Personal Development Plan specifically to later "justify" his termination of Mr. Bolton.

45.     Despite the fact that Mr. Powell created the Personal Development Plan almost immediately after Mr. Bolton's injury, Mr. Powell did not actually present the plan to Mr. Bolton until three weeks later on July 15, 2017.

46.     Meanwhile, Mr. Bolton returned to work as normal on Monday, June 27, 2017.

**E.     Mr. Bolton Informs Mr. Powell He Requires an MRI**

47.     Shortly after his injury, Mr. Bolton's treating physician prescribed him an MRI on his right upper arm.

48.     Mr. Bolton informed Chris Powell of his need for an MRI for worker's compensation purposes.

49.     In response, Mr. Powell told Mr. Bolton that "MRI's were very expensive" and Mr. Powell "didn't think [Mr. Bolton] needed one."

50.     Thereafter, over the next several days, Mr. Powell routinely discouraged Mr. Bolton from receiving an MRI.

51.     Eventually, after repeated requests, Mr. Bolton was forced to directly contact Tuff Shed's worker's compensation insurance carrier to schedule the MRI.

52.     At approximately the same general time, on July 15, 2017, Chris Powell summoned Mr. Bolton to his office and presented him with the adverse "Personal Development Plan" that Powell had previously, secretly created on June 26, 2017, immediately after Mr. Bolton's accident.

53.     Upon information and belief, Mr. Powell pretextually presented Mr. Bolton with the adverse Personal Development Plan in retaliation for Mr. Bolton requesting an MRI regarding his injury or; alternatively, for directly scheduling the MRI with Tuff Shed's worker's compensation carrier.

**F.     Mr. Powell Learns Mr. Bolton Requires Surgery and Mr. Bolton Requests Accommodation**

54.     Mr. Bolton underwent his MRI on July 22.

55.     After receiving the MRI, Mr. Bolton learned that his right bicep tendon had been completely ruptured.

56. Nevertheless, and despite significant pain and lack of mobility while attempting to lift, grip, or use his right arm, Mr. Bolton reported for duty each day of work and continued to excel in his job responsibilities.

57. Shortly after July 22, Mr. Bolton informed Chris Powell that he required surgery to repair his ruptured bicep.

58. Mr. Bolton informed Mr. Powell that he was scheduled to undergo surgery on August 3, and requested the day off for the surgery.

59. Mr. Powell approved the medical leave.

60. Prior to his surgery, Mr. Bolton understood that he might be without the use of his right arm while it healed for up to approximately three months after surgery.

61. Accordingly, prior to his surgery, Mr. Bolton twice asked Mr. Powell how Tuff Shed might reasonably accommodate Mr. Bolton's limitations related to his disability while his right arm healed.

62. On the first occasion, Mr. Bolton asked Mr. Powell if they could think about ways to accommodate Mr. Bolton's limitations relating to his disability, including whether Mr. Bolton could focus on indoor, managerial tasks, and Mr. Powell stated he "didn't think so" and then walked away.

63. On the second occasion, prior to Mr. Bolton's surgery, Mr. Bolton again asked Mr. Powell how they might accommodate Mr. Bolton's limitation related to his disability and Mr. Powell suggested Mr. Bolton might be able to focus on outdoor training exercises for the construction staff.

64. On August 1, which was almost immediately after Mr. Bolton requested reasonable accommodation, Mr. Powell summoned Mr. Bolton to his office and presented him with an

adverse Corrective Action Notice.

65. The Notice did not indicate deficiencies in any of the areas described on Powell's prior Personal Development Plan.

66. The Notice did not indicate deficiencies in any area in which Mr. Bolton had ever before been admonished, counseled, or reprimanded.

67. The Notice alleged that Mr. Bolton was late for work multiple days in July and that he failed to follow instructions from Mr. Powell on July 29.

68. The allegations in the Notice were not accurate.

69. Mr. Powell's instruction referenced in the Notice was to bring certain lumber materials into the warehouse. However, those materials were molded and could not be safely stored in the warehouse.

70. Mr. Powell was aware of this and, upon information and belief, issued this instruction to Mr. Bolton as pretext for reprimand.

71. Upon information and belief, Mr. Powell knew that Mr. Bolton would either complete the task, in which case Mr. Powell would reprimand Mr. Bolton for completing unsafe work practices; or, alternatively, Mr. Bolton would not complete the task, in which case Mr. Powell would reprimand Mr. Bolton for failing to follow instructions.

72. Regarding Mr. Bolton's alleged lateness, although Mr. Bolton did not arrive at the office at the same time each day due to workflow routines, Mr. Powell was aware of this and had tacitly approved. It was only after Mr. Bolton became disabled and requested reasonable accommodation that Mr. Powell pretextually and retroactively objected to Mr. Bolton's morning workflow routines.

73. In reality, Mr. Powell pretextually issued the Corrective Action Notice to Mr. Bolton

because Powell had already determined to terminate Mr. Bolton because of his disability; or, alternatively, because Powell was punishing Mr. Bolton in retaliation for Mr. Bolton requesting reasonable accommodation and sick leave.

74. Nevertheless, Mr. Bolton reported to work as regularly scheduled on August 2 without incident.

75. Mr. Bolton successfully underwent surgery on August 3.

**G.  Mr. Bolton Tells Powell about His Temporary Restriction, and Powell Hangs Up on Him**

76. On August 3, shortly after his surgery, Mr. Bolton's physician indicated that Mr. Bolton needed to keep his wound cool and dry for several days while his incision healed.

77. That same day, Mr. Bolton contacted Chris Powell and alerted him of the restriction, and that Mr. Bolton required reasonable accommodation in terms of short-term, additional leave while his incision healed.

78. Mr. Powell shouted into the phone "THAT'S GREAT, THAT'S JUST GREAT! THAT'S REALLY GOING TO PUT US IN A BIND!"

79. Powell immediately hung up on Mr. Bolton.

80. Notwithstanding his outburst, Mr. Powell acceded to the request for additional leave.

81. On August 15, Mr. Powell texted Mr. Bolton and instructed him to report back to work on August 16.

**H.  Powell Terminates Mr. Bolton**

82. Mr. Bolton reported for work as instructed on August 16.

83. Mr. Powell immediately summoned Mr. Bolton to Powell's office.

84. There, Mr. Powell informed Mr. Bolton that he was terminated.

85. Mr. Powell did not give any explanation whatsoever for Mr. Bolton's termination.

86. Later, Mr. Bolton contacted Tuff Shed human resources employees who confirmed that Tuff Shed, through Chris Powell, terminated Mr. Bolton's employment because of alleged poor performance.

87. During the subsequent EEOC investigatory process, Tuff Shed alleged again in a writing to the EEOC that Mr. Bolton was terminated for poor performance.

88. Upon information and belief, within a few weeks after he terminated Mr. Bolton's employment, Chris Powell replaced Mr. Bolton in the production manager position with another employee who was not disabled.

**I.     The Aftermath**

89. Mr. Bolton originally relocated himself and his family to Louisiana specifically to work for Tuff Shed out of its Laplace office.

90. After Tuff Shed terminated Mr. Bolton's employment because of his disability or in retaliation for engaging in protected activity, Mr. Bolton made the reasonable financial decision to return home to Texas so that he could rely on his personal support network while he attempted to find replacement employment.

91. Despite his diligent job search, Mr. Bolton remained unemployed for several months.

92. Mr. Bolton eventually found replacement work in the field of disaster-related casualty inspections.

93. Nevertheless, Tuff Shed's employment discrimination cost Mr. Bolton several months of lost back wages, lost fringe benefits, out-of-pocket costs associated with returning to Texas, humiliation, and mental stress and anguish.

**J.     Tuff Shed's Termination Decision Was Discriminatory**

94. At all relevant times, and specifically at the time of his termination, Mr. Bolton suffered

from a physical impairment to his musculoskeletal system, specifically his right bicep tendon, which caused Mr. Bolton to suffer substantial limitations in his daily work and life activities, such as lifting, grasping, and suffering through significant pain while performing physical activities.

95. Alternatively, although Mr. Bolton did not suffer from a substantially limiting physical impairment, Tuff Shed, through its general manager, regarded Mr. Bolton as suffering from such an impairment.

96. At all relevant times, Tuff Shed, through its general manager Chris Powell, knew of Mr. Bolton's on-the-work injury, his ruptured bicep tendon, his need for surgical repair, his surgery, his post-operative medical leave, and his physical impairment to his right bicep which caused Mr. Bolton to suffer substantial limitations in his daily work and life activities, such as lifting, grasping, and suffering through significant pain while performing physical activities.

97. At all relevant times, Tuff Shed, through its general manager Chris Powell, knew that Mr. Bolton had twice requested reasonable accommodation for the duration of his disability and the substantial limitations it caused.

98. At all relevant times, Mr. Bolton was qualified for the position of production manager.

99. Alternatively, at all relevant times, Mr. Bolton was qualified for the position of production manager with reasonable accommodation.

100. At all relevant times, Mr. Bolton had the physical and mental capabilities sufficient to perform all the essential job functions, with or without reasonable accommodation, assigned to the production manager position.

101. At no time did Mr. Bolton pose a direct threat to himself or to any of his potential co-workers.

102. Tuff Shed, through its general manager Chris Powell, terminated Mr. Bolton's employment specifically because of Mr. Bolton's disability.

103. Alternatively, Tuff Shed, through its general manager Chris Powell, refused to accommodate the limitations caused by Mr. Bolton's disability, and further refused to even engage in a good-faith interactive process to identify a reasonable accommodation to accommodate Mr. Bolton's limitations, and this refusal directly led to Mr. Bolton's termination.

104. Alternatively, Tuff Shed, through its general manager Chris Powell, terminated Mr. Bolton's employment because Mr. Powell regarded Mr. Bolton as disabled.

105. Alternatively, Tuff Shed, through its general manager Chris Powell, terminated Mr. Bolton in retaliation for Mr. Bolton engaging in protected activities under the Americans with Disabilities Act, specifically requesting reasonable accommodation.

106. In any event, Tuff Shed, through its general manager Chris Powell, would not have terminated Mr. Bolton's employment but for Mr. Bolton's disability; or alternatively Mr. Bolton's need for reasonable accommodation; or alternatively Mr. Bolton being regarded as disabled; or alternatively in retaliation for engaging in protected activities.

107. Tuff Shed, through its general manager Chris Powell, treated Mr. Bolton less favorably than it treated other employees who were not disabled; or alternatively who did not require reasonable accommodation; or alternatively who were not regarded as disabled; or alternatively who did not engage in protected activities.

## CAUSES OF ACTION

A. **Disability Discrimination Under the Americans with Disabilities Act**

108. Pursuant to the Americans with Disabilities Act (as amended), an employer may not discriminate against an employee "on the basis of disability in regard to . . . [the] discharge of

employees. . . ." 42 U.S.C. § 12112(a).

109.  Relevant here, to make out a prima facie case of disability discrimination, a plaintiff must prove "(1) that he has a disability; (2) that he was qualified for the job; [and] (3) that he was subject to an adverse employment decision on account of his disability." *E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 697 (5th Cir. 2014). "Disability" means that the plaintiff "is disabled, has a record of having a disability, or is regarded as disabled." *E.E.O.C. v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009).

110.  In the first instance, a plaintiff is "disabled" if he suffers from "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1). Relevant here, an "impairment" is "[a]ny physiological . . . condition . . . affecting one or more body systems, such as . . . musculoskeletal[.]" 29 C.F.R. § 1630.2(h)(1). An impairment is substantially limiting when considering "the pain experienced when performing a major life activity," or the "difficulty, effort, or time required to perform a major life activity." 29 C.F.R. § 1630.2(j)(4)(ii).

111.  Alternatively, a plaintiff is disabled when he is "regarded as disabled." 42 U.S.C § 12102(1)(c). A person is "regarded as disabled" when he is "subjected to an action prohibited under the ADA because of 'an actual or perceived' impairment regardless of whether the impairment is, or is perceived to be, substantially limiting." *Kennedy v. Parkview Baptist Sch., Inc.*, 13-478, 2014 WL 7366256 at *6 (M.D. La. Dec. 24, 2014) (citing 42 U.S.C. § 12102(3)(A); 29 C.F.R. § 1630.2(l)(1)-(3)). Further, "[t]he effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of [regarded as disabled]." 29 C.F.R. § 1630.2(j)(1)(ix).

112.  An employer who discriminates against a disabled employee by terminating his

employment is liable for the employee's resulting damages, including lost back wages, compensatory damages, litigation costs, and attorney's fees. An employer who does so intentionally or recklessly is also liable for punitive damages.

113. In this case, Mr. Bolton completely ruptured his right bicep tendon while at work. His musculoskeletal system was damaged, and Mr. Bolton could no longer effectively lift, grip, pull, or push with his right arm while performing daily life and work activities, and when he attempted to do so he experienced significant pain. Accordingly, Mr. Bolton suffered a disability and resulting, substantial limitations.

114. Almost immediately after Mr. Bolton suffered his disability, his supervisor and decision-maker, Chris Powell, subjected him to adverse employment actions all for the purpose of pretextually terminating Mr. Bolton's employment.

115. More specifically, Mr. Bolton was injured on a Thursday afternoon. That Sunday, Mr. Powell concocted a pretextual "Personal Development Plan" for the purpose of creating a justifiable excuse to later terminate Mr. Bolton. At no time had Mr. Bolton ever been admonished that he was performing his duties unsatisfactorily prior to his disability. Indeed, prior to his disability, Mr. Powell had praised Mr. Bolton's achievements, which had objectively increased the value and profitability of the Laplace store. Powell did not reveal his secret development plan to Mr. Bolton until three weeks later, on July 15.

116. Also around July 15, Mr. Bolton informed Powell that he required surgery on his bicep. Mr. Bolton twice asked Powell for an accommodation while Mr. Bolton healed from his disability. Powell first responded by simply walking away from Mr. Bolton. Later, Powell suggested that perhaps Mr. Bolton could focus on outdoor training exercises. Almost immediately thereafter, Mr. Powell pretextually issued Mr. Bolton a "Corrective Action Notice"

which alleged Mr. Bolton had disregarded an instruction from Mr. Powell and had been late to the office in July. In reality, the allegations were untrue in context. It was only after Mr. Bolton injured himself and requested accommodation that Powell retroactively punished Mr. Bolton for these alleged performance issues.

117. On August 3, Mr. Bolton underwent surgery and was restricted by his physician against working in environmental conditions that would prevent his wound from healing. When Mr. Bolton telephoned Powell and informed him of the restriction, Powell shouted into the phone "THAT'S GREAT, THAT'S JUST GREAT, THAT'S REALLY GOING TO PUT US IN A BIND!" and hung up.

118. When Mr. Bolton arrived back for his first day at work after his surgery, Powell summarily fired him without reason. Only later did Tuff Shed claim that Mr. Bolton was terminated for poor work performance.

119. Mr. Powell then immediately replaced Mr. Bolton with a new hire who was not disabled.

120. Mr. Powell would not have terminated Mr. Bolton but for Mr. Bolton's disability.

121. Alternatively, even if Mr. Bolton's bicep injury did not render him disabled, Powell regarded him as disabled because of the injury. Powell's actions immediately after Mr. Bolton's injury up until termination were taken not because Mr. Bolton was actually a poor performer (because Mr. Bolton was, objectively, an exceptional performer), but instead because Powell did not want to deal with a disabled manager in the workplace or engage in discussions regarding accommodations. Powell would not have disciplined Mr. Bolton or terminated him but for Mr. Bolton's disability or, alternatively, Powell's perception that Mr. Bolton was disabled.

122. Upon information and belief, Chris Powell intentionally and purposefully terminated Mr. Bolton in violation of the Americans Disabilities Act.

123. Accordingly, Tuff Shed is liable to Mr. Bolton for all statutory and equitable damages caused by its illegal employment discrimination, including lost back wages, lost future wages, compensatory damages, punitive damages, litigation costs, and attorney's fees.

B. **Retaliation for Engaging in Protected Activities under the Americans with Disabilities Act**

124. An employer may not retaliate against an employee for engaging in protected activity under the Americans with Disabilities Act. In the Fifth Circuit, "[i]t is undisputed that making a request for a reasonable accommodation under the ADA may constitute engaging in a protected activity." *Tabatchnik v. Cont'l Airlines*, 262 Fed. Appx. 674, 676 (5th Cir. 2008). A plaintiff establishes a prima facie case of retaliation by showing that "(1) she participated in an activity protected under the statute; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse action." *Feist v. Louisiana, Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013). A plaintiff may satisfy the causal connection element "by showing '[c]lose timing between an employee's protected activity and an adverse action against him.'" *Id.* (internal citations omitted). In the Fifth Circuit, a span of four months between request and adverse action has been held sufficiently close. *See Evans v. Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (so noting, and holding that a span of five days was sufficiently close to prove causation in the instant case).

125. In this case, as alleged, Mr. Bolton injured himself at work and became disabled. Staring around the middle of July, Mr. Bolton twice asked Mr. Powell for a reasonable accommodation after he returned from his one day of medical leave. In the first instance, Mr. Powell declined the discussion and simply walked away. In the second instance, Mr. Powell suggested that Mr. Bolton might focus on outdoor training exercises. But within a few days thereafter, on August 1, Mr. Powell issued Mr. Bolton a "Corrective Action Notice" alleging poor work performance.

The Notice was not factually accurate and was based on conduct that Mr. Powell had never admonished Mr. Bolton for prior to requesting a reasonable accommodation. Two days later, when Mr. Bolton alerted Powell that he would be temporarily restricted from outdoor training activities and would require additional accommodation in terms of short-term medical leave, Powell became furious and shouted "THAT'S GREAT, THAT'S JUST GREAT! THAT'S REALLY GOING TO PUT US IN A BIND!" and hung up on Mr. Bolton. Then, on Mr. Bolton's first day back to work, Powell summoned Mr. Bolton to his office and summarily terminated him. Powell did not give Mr. Bolton any reason for the termination.

126. Mr. Bolton was a proven performer at Tuff Shed and was widely praised by Mr. Powell prior to Mr. Bolton becoming disabled. However, almost immediately after Mr. Bolton requested accommodation during his disability, Mr. Bolton issued him a pretextually created "Corrective Action Notice." Mr. Bolton worked the next day without incident. The day after that, Mr. Bolton left on medical leave for surgery. While Mr. Bolton was on leave, Mr. Powell apparently decided to terminate him. When Mr. Bolton reported for his first day back to work, Mr. Bolton summarily fired him without reason. The only difference in Mr. Bolton's performance between the time when Mr. Powell widely praised Mr. Bolton and when Mr. Powell terminated Mr. Bolton was Mr. Bolton's disability and request for accommodation.

127. In fact, and upon information and belief, Mr. Powell specifically terminated Mr. Bolton in retaliation for Mr. Bolton requesting accommodation and engaging in protected activity under the ADA. Mr. Powell would not have terminated Mr. Bolton but for his request for accommodation.

128. Upon information and belief, Chris Powell intentionally and purposefully terminated Mr. Bolton in violation of the Americans Disabilities Act.

129.    Accordingly, Tuff Shed is liable to Mr. Bolton for all statutory and equitable damages caused by its illegal employment discrimination, including lost back wages, lost future wages, compensatory damages, punitive damages, litigation costs, and attorney's fees.

## JURY DEMAND

Mr. Bolton requests a trial by jury on all issues.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Clinton M. Bolton prays that this complaint be deemed good and sufficient; that it and summons be served upon defendant Tuff Shed, Inc.; and, after due proceedings are had, that judgment be entered in favor of plaintiff and against defendant for all damages and equitable relief due to plaintiff, including lost back wages, lost future wages, compensatory damages, punitive damages, litigation costs, attorney's fees, and legal interest from the date of demand, and for all other general and equitable relief to which plaintiff is entitled.

Respectfully submitted:

/s/ Kevin S. Vogeltanz
Kevin S. Vogeltanz, TA (Bar #32746)
The Law Office of Kevin S. Vogeltanz, LLC
823 Carroll Street, Suite A / Mandeville, LA 70448
Telephone:  (504) 275-5149
Facsimile:  (504) 910-1704
Email: vogeltanz@gmail.com

*Attorney for Clinton M. Bolton*

**Clerk of Court:**
**Please hold summons while plaintiff attempts to secure waiver of service from defendant.**